Moore v. Farmer.

## MOORE, Appellant, v. FARMER.

### Division One, March 30, 1900.

1. **Practice:** ACTION AT LAW: EVIDENCE. In an action at law the appellate court will not reverse the judgment of the trial court on a question of fact, if there is any substantial evidence to support it.

2. **Public Lands:** NAVIGABLE STREAM: MISSOURI RIVER. A grantee from the United States of land in this State on the banks of a navigable stream, such as the Missouri River, takes only to low water mark, and not to the middle of the stream.

3. ——: ——: ——: ISLAND. The owner of the bank on the Missouri river is not, by reason thereof, the owner of an island which springs up in the midst of the river.

4. ——: ——: ——: ——: ACCRETION. When in such case by accretion to the island its water margin unites with the main shore, the newly made land becomes a part of the island, and not of the main land, and the riparian ownership is not extended. (Cooley v. Golden, 117 Mo. 33, followed.)

5. **Lands:** ACCRETION GRANTED TO COUNTIES. Under the laws of 1895, page 207, the title to islands formed in the navigable waters of this State is vested in the counties within which such islands are formed.

Appeal from Callaway Circuit Court.—*Hon. John A. Hockaday,* Judge.

AFFIRMED.

*N. D. Thurmond* for appellant.

(1) The court erred in admitting the deed from Callaway county to defendant. In no case could these lands belong to the State or county. First, because they were not formed

VOL. 156 mo—3

by the recession and abandonment by the waters of the Missouri river of its old bed. Secondly, because this land is formed by accretion or reliction, and its formation was within the limits of the riparian owners, and the law as declared by the Supreme Court of this State gives this land to the river's edge to the riparian owner. The Act of 1895 creates no new ownership of river lands, but simply transfers what already or should thereafter belong to the State to the counties. Laws 1895, p. 207, sec. 1 and 4; St. Louis v. Rutz, 138 U. S. 245; Buse v. Russell, 86 Mo. 216; Cooley v. Golden, 117 Mo. 48. (2) This court in Cooley v. Golden, 117 Mo. 33, held that riparian ownership extends only to the margin of the water on navigable streams, not within tide water, against the common-law rule that it extends to the middle of the stream. This opinion is in the face of the common law adopted by this State, and seems to have been based upon decisions of the U. S. Supreme Court. If the common-law rule should prevail in this case, the land formed between the north bank and the thread of the stream, even though not joined to the bank, would belong to the riparian owner and not to the State. Since the former decisions of the U. S. Court that court in Hardin v. Jordan, 140 U. S. 371, declared that the common-law rule was in force in Illinois and that riparian ownership extends to the *medium filum acquae.* If this common-law rule applies in Illinois where the common law is in force, why does it not apply in Missouri? We submit that the dissenting opinion of Brace, J., in Cooley v. Golden, 117 Mo. 52, is founded upon the common law and upon reason and that that opinion is the law in this State. If that is declared by this court to be the law in this State it will settle once for all a great deal of litigation that will grow out of the act of 1895.

*David H. Harris* and *S. D. Chamberlin* for respondent.

(1) Appellant complains of the action of the trial court in permitting defendant to offer in evidence the deed or

patent from Callaway county conveying to him the lands in controversy. In this the court did not commit error, because this deed constitutes, in part, defendant's paper title. Laws 1895, p. 207. (2) Appellant next complains of the trial court in refusing to give instruction numbered 1 asked by plaintiff. This instruction did not properly declare the law and the court did not commit error in refusing to give it in the form asked. Cooley v. Golden, 117 Mo. 33; Cox v. Arnold, 129 Mo. 337; Perkins v. Adams, 132 Mo. 131. (3) As to whether riparian proprietors on the banks of navigable streams in this State own to the water's edge only or to the middle thread of the stream is a settled question. The doctrine of *stare decisis* applies here with unusual force. Beginning with the case of Benson v. Morrow, 61 Mo. 345; the principle that riparian proprietors on the banks of navigable streams in this State hold title to the water's edge only—their boundary advancing or receding at all times with the water— has been repeatedly announced and confirmed by this court. This is no longer a debatable question, and in actions of this kind the inquiry is simply one of fact. Is the land in controversy an accretion to the main shore or is it an independent formation of land out in the channel of the river? Upon this issue of fact the trial court found for defendant. Cooley v. Golden, 117 Mo. 33; Cox v. Arnold, 129 Mo. 337; Perkins v. Adams, 132 Mo. 131; Benson v. Morrow, 61 Mo. 345; Hahn v. Dawson, 134 Mo. 581. (4) The third instruction given on the part of defendant correctly declares the law and the evidence was amply sufficient to warrant the court in giving it. Mulry v. Norton, 100 N. Y. 426; Black's Pomeroy on Water Rights (1893 Ed.), sec. 220; Pollard v. Hogan, 3 How. 212. The doctrine of accretion will scarcely admit of jumping a slough forty to sixty yards wide. In other words there is nothing saltatory about accretion. Crandall v. Smith, 134 Mo. 640. And it makes no difference that a small portion of the lands in controversy may have formed within the bounds

of the lands originally granted by the government to Scott in
1833. Cox v. Arnold, 129 Mo. 337. (5) The grantee, in
a quitclaim deed, takes only what the grantor can convey,
whether that be something or nothing, and if it should turn
out that the grantor has no interest, the grantee will not be
heard to complain. If there was any title afterwards acquired
by the grantee, said deed was inoperative to convey it. Mann
v. Best, 62 Mo. 491; Ins. Co. v. Landis, 50 Mo. App. 116;
Moore v. Harris, 91 Mo. 616; Ford v. Unity Church, 120
Mo. 509. (6) Instruction numbered 7, given on behalf of
defendant, correctly states the law applicable to this case.
There was absolutely no evidence tending to show that any of
the streets or roads in the town of Cedar City had been va-
cated. Declarations of law must be predicated upon the evi-
dence, and it would be error to declare upon a theory not
justified by the evidence, or to assume facts not detailed in
evidence. State v. Mason, 96 Mo. 559; McMurry v. Martin,
26 Mo. App. 369; McQuillin's Pl. & Prac., sec. 773. (7)
This court has repeatedly declared that it will not interfere
with the finding of the trial judge, except in case of manifest
prejudice or misconduct, nor will it reverse on the weight of
the evidence. Bray v. Kemp, 113 Mo. 552; Brown v. Brown,
106 Mo. 611; Minton v. Steele, 125 Mo. 181.

MARSHALL, J.—Respondent's statement of the facts in
this case is as follows:

"This is an action in ejectment brought by appellant
Moore in the Callaway Circuit Court to recover possession of
55.27 acres of land in Callaway county, which had formed in
the Missouri river south and west of the town or village of
Cedar City, and lying across and slightly up the river from
Jefferson City. In 1833 all land lying in the northwest
fractional quarter of section 16, township 44, range 11 in
Callaway county was bought by one W. B. Scott. At that
time the river ran over a large part of this quarter section,

there being in fact but 69.56 acres of the 160 uncovered by the river at this time.    Between the date of purchase by Scott in 1833 and the year 1871 the river further encroached upon this land until there was probably not more than 40 acres left. In this year all that part of this fractional northwest quarter section lying east of Cedar Creek passed into the hands of the Cedar City Land Co., a corporation formed for the purpose of laying out and putting upon the market lands embraced within the original limits of the village of Cedar City.    The village was laid out as shown by the plats attached to appellant's and respondent's abstracts—Water street, 75 feet wide, ran parallel with the river and so far as the evidence and the plats disclose, the outer or southern line of this street was parallel and coincident with the then north bank of the Mo. River, or at least was as nearly so as the formation and slight irregularities of the bank would permit.    Lots facing the river and abutting upon Water street were sold by the town company to various persons.    Afterwards, but at just what time the evidence does not disclose, the river bank at this point began to wash away until Water street was entirely gone, likewise a considerable portion of the town adjacent thereto, and the river bank had reached the point marked by the heavy dotted line on the following plat:

N.

Line between Sections 9 & 16, Twp 44 R 11.

Station.

qr. Sec. cor. 9 & 16,

4th St.

Former Channel of Cedar Creek.

Slough

Cedar St.

B

3rd St.

Walnut St.

C

Locust Street

D

Slough

St.

Slough

Slough

Slough

Water

E

River Bank

Hiad's Land.

Govn't Dike

F

at Time town was

17 3d Acres.
Sw pt NE NW.
16-44-11

Street

1st St.

H

laid out.

Public Road

E.

Slough

W.

34 87 Acres
SE. NW
16-44-11

Public Road.

Present

Water's edge or River Bank.

Govn't Dike

Center of
Sec. 16-44-11

MISSOURI RIVER.

3 90 Acres
NE frac. pt.
N E. SW
16-44-11

S.

Plat of
CEDAR CITY, MO.,
And Lands in controversy.
Light dotted lines indicate portion
of town washed away by River.
Heavy dotted line shows old or
high bank of River

"As far back as 1866 there had been a tow head or sand
bar out in the river in front or south of Cedar City.   In high
water this sand bar or tow head would be entirely covered
with water, but afterwards it would appear in the same place,
although sometimes changed in outline and extent, but during
all this time a considerable portion of the river flowed between
this formation of land and the main bank at Cedar City, at one
time the main channel being next to the Callaway shore.
Between the years 1878 and 1884 the river cut heavily on
its north bank at a point some 4 or 5 miles up from Cedar City
until a union was formed with Cedar Creek, the waters of
which creek from that time emptied into the river at this
point of contact, instead of through its old and former channel
which originally formed the western boundary of Cedar City,
joining the river at that point.   From this time on, the tow
head or sand bar in front of Cedar City grew more rapidly,
caused no doubt by the large amount of soil and debris taken
from the bank at the point up the river as above mentioned.
In 1884 this tow head or sand bar was of such size and
definiteness that it was called an island, and in 1885 one R. S.
McDonald took possession of it and sowed it in turnips, cross-
ing his teams over to it in a flat boat.   From that year to the
present time this island has remained a definite body of land,
constantly increasing in size, extending its length up and
down the river and towards the north or Callaway shore, until
now it is separated from the old or former bank of the river
in front of Cedar City by a slough or deep depression only.
During these years in very high water this island would be
submerged, but after the water had gone down, it would
reappear, increased in size and higher above the level of the
water than it had been before.   Land had also begun to form
up the river from Cedar City some 2 or 3 miles at or near the
old Tarleton place, and according to the testimony of some of
the witnesses, extended down the river in peninsular form
until it joined the land in front of Cedar City, broken, how-

ever, by occasional "reefs" (as they were termed by the witnesses) or channels through which the waters of the river continually flowed.

"In 1892 and 1893 the United States Government put in a system of dikes, extending from the Callaway shore out into the river. Two of these dikes are shown on the plat attached hereto. At the time these dikes were constructed the river was unusually high, permitting the government construction boats to go over the land now in controversy except for a space of some 80 or 100 feet near the center of the land, at which point the water was too shallow, and where, as testified by some of the witnesses, the land showed dry above the water. At this very time, however, the water was very deep next to the bank in front of Cedar City, ranging in depth from 8 to 20 feet, and a portion of the current was continuously running swift and strong between the island and the shore at Cedar City.

"After the dikes had been completed the growth of land out in the river was more rapid and the space between same and the Callaway shore was narrowed by accretions to the bank of the island, until, at the time of the institution of this suit, it was nothing more than a slough or channel through which, however, a small quantity of river water was still flowing.

"In front of Cedar City and for a considerable distance up and down the river from that point very little if any land has accreted to the main bank on the Callaway side, and the slough or channel which marks the line between the lands formed in the river and the shore is quite close to the old or main bank, ranging in distance from a few feet to as far possibly in some places as 100 feet.

"From 1885 down to the year 1895, R. S. McDonald was in continuous possession of the lands in controversy, getting his fire wood and pasturing his cattle there, and fencing it, but it seems the trial court did not consider his possession exclusive as he permitted others to use the lands for the same purpose.

In 1895 McDonald quitclaimed his interest in the land to respondent, who then fenced it. In 1896, upon petition of citizens living in the vicinity, and under authority of an act of the 28th General Assembly entitled: 'An act to grant certain lake and river bed lands to the counties in which they are located for school purposes' and approved April 8th, 1895, the county court of Callaway county directed the county surveyor to locate, survey and plat all lands in Callaway county between certain designated lines, formed by the recession from or abandonment of its old or former bed by the waters of the Missouri river. Under this order of the county court the county surveyor located, surveyed and platted about 600 acres, including the lands now in controversy, the description of which, as contained in plaintiff's petition, is taken from said surveyor's report and plat. Subsequently all of this land so located and surveyed was sold by Callaway county and the 55.27 acres now in controversy was bought by defendant, he paying $305, or about $6 per acre therefor, and a patent from the county was issued to him on the 6th day of May, 1896.

"In 1891 Appellant Moore was operating a steam ferry across the Missouri river at Cedar City, and about this time he obtained in consideration of the sum of $75 a quitclaim deed from the Cedar City Land Co. to lots 11, 12, 13 and 14 in block G in Cedar City and an undetermined interest in certain lands described as 'all of the land south of Cedar City to the bank of the Missouri river, and also all that part of section 16, township 44, range 11 that lies south of and adjoining the land sold by said company to John Haid, thence south to the Missouri river.' At the date of this quitclaim deed a portion of all the lots in block G conveyed to Moore had been washed away by the river, none of them were perfect lots and all of Water street was in the river. The bank of the river at that time, as nearly as can be determined, is indicated by the heavy dotted line on the plat attached hereto. Under this deed Moore did not attempt to exercise any of the rights

of ownership over nor did he at that time claim any of the land now in controversy, but he did bring an action in the local magistrate's court against McDonald for trespass in using Moore's bank as a landing at a point which McDonald thought was at the foot of Locust street, but which proved to be east of that point and south of Haid's land.

"The land in controversy is all south and west of Cedar City. None of it is south of the Haid land. As shown by the plat of Cedar City, and by the plat above set out, the line dividing the east and west halves of section 16 forms the east boundary line of Locust street in Cedar City, and a south extension of this same line marks the east boundary of the lands in controversy.

"Sometime after the sale by the county and purchase by respondent this suit was brought by appellant to secure possession of said lands. Defendant interposed a general denial of plaintiff's title or right to possession, and affirmatively asserted title in himself by possession for more than ten years and by purchase from Callaway county. Trial was had before the court without a jury."

It is only necessary to supplement this statement with the further remark that, as shown by the testimony and by the plats, there is a slough extending along the whole front of Cedar City at a point north of what is termed, on the plat above set out, Water street, and which covers parts of lots lying on the north side of Water street, as shown on the plat. This slough separates the land in controversy from the south line of said lots, so that the land in controversy is not joined to the Cedar City land or what was formerly the north bank of the Missouri river, after Water street and the lots abutting it on the north were washed away.

The plaintiff asked and the court refused to give the following instructions:

"1. The court declares the law to be that if the land in controversy was formed by accretion or reliction to the main

Moore v. Farmer.

bank of the Missouri river and that if the land on the bank of said river had been sold by the county for the benefit of the school fund, then the county of Callaway conveyed no title by the sale and deed to defendant under which he claims.

"2. Even though the old bank of the Missouri river washed away and the river cut in and took away the whole of Water street in Cedar City and encroached upon and carried away some of the lots north of said Water street, yet if said Water street was replaced by accretions to the north bank of said river and the land on the bank thereof was restored and other land was added thereto by the accretions from said river, then the title to said land is in the original owners of the land on the bank of said river or their assignees."

At the request of defendant the court gave the following instructions:

"1. The court instructs that the Missouri river is a navigable stream and that riparian owners along said river own to the water's edge only—their line expanding as the waters recede and accretions form to the land, and contracting as the waters encroach upon and wash away their land, the line always remaining at the water's edge. But the formation or reliction must be gradual and imperceptible and must be made to the contiguous land so as to change the position of the water's edge or margin. And if it is shown by the preponderance of the testimony in the case that the land in controversy first appeared as an island or formation of soil, sediment or other substances out in the midst of the Missouri river, to which accretions were formed from the deposit of soil and other substances by the waters of said river, until the banks of said island or formation extending northward, united with the main bank of the river, or was separated therefrom by a slough or depression only, then such lands are not an accretion to the main bank of the river and the plaintiff, Moore, has no title thereto as a riparian owner, and the verdict should be for the defendant.

"3. The court instructs that if it is shown by the weight of the evidence that the lands mentioned in plaintiff's petition were formed by the recession from or abandonment of its old or former bed by the waters of the Missouri river and not by gradual and imperceptible accretions to the main bank of said river, or if it is shown by the weight of the testimony that said lands were originally an island or formation of soil and other substances which first appeared in the channel of said river and which was enlarged by accretions thereto caused by the deposit of soil and other substances by the waters of said river until the bank or shore of such island or formation in extending northward reached the main or old bank of said river, or was separated therefrom by a slough or depression through which the waters of said river flowed; that then the title to said lands was in the State of Missouri and such title was by said State by an Act of the 38th General Assembly of Missouri entitled: 'An Act to grant certain lake and river bed lands to the county in which they were located for school purposes,' and approved April 8th, 1895, vested in the county of Callaway in said State, and plaintiff has no title to same as an accretion to lands claimed to be owned by him on the banks of said river. And that if said county did by its deed and patent issued by order of the county court of said county bearing date the 6th day of May, 1896, conveying to defendant its said title to said land then the verdict must be for defendant.

"4. To establish plaintiff's right to the lands in controversy it must be shown by a preponderance of the testimony that such lands are an accretion to lands to which plaintiff has title under his deed of quitclaim from the Cedar City Land Co., and that such accretions are the gradual and imperceptible growth or increase of such land, caused by the deposit of earth, land or sediment thereon by the contiguous waters of the Missouri river; and that at the time of the execution and delivery of said deed to plaintiff by the Cedar City Land Co., the lands

mentioned in said deed actually existed and said company was possessed of the fee thereto; otherwise the verdict must be for the defendant.

"7.  If there is a public street between plaintiff's lands or lots and constituted the southern boundary line of same, then plaintiff is not entitled as a riparian proprietor to accretions formed on the opposite side of such street and as to all such lands so formed the verdict must be for the defendant.

"9.  If the lands in controversy are a part of a peninsular or sand bar in the Missouri river which first began forming at or near the main bank of said river some two or three miles up the stream from the lands claimed by plaintiff under deed of quitclaim from the Cedar City Land Co., and then by additional formations, broken by occasional sloughs or channels through which the river water flowed, extended down the river until said formation appeared out in the channel of the river in front of and below the water front of Cedar City, and that between the lands so formed and Cedar City a considerable current of river water flowed and continues so to flow, and that afterwards the lands so formed in front of said town, by accretions thereto, gradually extended its north bank until it had reached the old or high bank of the river in front of said town, but was separated from such old bank by a slough or depression through which river water continued to flow more or less continuously then such lands so formed in front of Cedar City are not an accretion to the main bank of the river in front of said town and plaintiff has no title thereto as a riparian owner and the verdict must be for defendant."

The court entered judgment for the defendant, and plaintiff appealed.

## I.

It is plain from the testimony and the instructions refused and given that the trial court found the fact to be that the land in controversy was not an accretion to the main land,

but was an island, and the accretions thereto, which sprang up in the Missouri river and has not yet become joined to the main land, but is still separated therefrom by a slough. This must have been the finding of fact by the trial court, else that court would have given the plaintiff's instructions and refused those asked by the defendant, for the plaintiff's instructions were predicated upon the fact being that the land is an accretion to the main land while the defendant's instructions proceed upon the theory that the land is an island.

There is evidence sufficient to support the finding of fact that the land is an island, and as this is an action at law, this court will not reverse the judgment of the trial court on a question of fact if there is any substantial evidence to support it. The fact that this land is an island must, then, be taken as established in this case, and the only matter open to review in this court is the ruling of the trial court upon propositions of law. The fact is, that, when the town of Cedar City was laid out by the land company, Water street was the southern boundary of the town, and the north bank of the river. Afterwards Water street, the whole of block "H," all of block G, except a very small triangle on the northeast corner of lots 11 and 12, and a considerable portion of block E was washed away, and there *is* a slough now separating this island from the main land which lies north of where *Water* street formerly was and covers a portion of what formerly was blocks E, G and H. When the plaintiff purchased from the Cedar City Land Company "lots 11, 12, 13 and 14 in block G, also all land south of Cedar City to the bank of the Missouri river, and also all that part of section 16, township 44, range 11, south of and adjoining the land sold by the Cedar City Land Company to John Haid, thence to the bank of Missouri river," in September, 1890, there was in existence no such thing as lots 13 and 14 of block G, for the slough ran where those lots formerly were, and there was only a small triangle left of lots 12 and 11, lying at the northeast corner

of block G.   There was no land south of Cedar City, except this island, which, as before stated is not connected with the main shore.

The plaintiff's claim rests entirely upon the proposition that this land is an accretion to the main land, while defendant's contention is that this land is an island which has never become joined to the main land.   In Cooley v. Golden, 117 Mo. 33, this court held that the title of a riparian owner extended only to low water mark, and not to the middle of the stream, as is the law in Illinois and in some other jurisdictions; that the riparian owner must stand the loss of land washed away by the encroachment of the river and as a correlative right is entitled to the gradual and imperceptible accretions which are joined to his land, but that he has no right to an island which springs up in the river, and that "if by accretions to such island the water margin should unite with the shore, the new made land would become a part of the island and not of the main land, and the riparian ownership would not be extended.   It is so held in Buse v. Russell, 86 Mo. 209, and Naylor v. Cox, *supra.*   It makes no difference in principle that the islands in these cases have been surveyed and disposed of by the United States.   The riparian owner would not take the accretion for the reason that it was not added to his own land."   In Cooley's case, the island had become joined to the shore, and it was held that the plaintiff, the riparian owner, was only entitled to so much as was an accretion to his land  but not to the island or so much as was an accretion to the island.

The plaintiff in this case recognizes that if Cooley's case, and the prior cases upon which it was based, is to be followed, the judgment of the circuit court is right, but he urges this court to follow the common law as the Illinois courts have done, and hold that the riparian owner's title extends to the centre of the thread of the main channel, and hence he is

entitled to all land, whether accretions or islands, that forms opposite his land and on his side of the river.

The decision in Cooley's case was not reached hastily or unadvisedly. It was decided by the court in Banc, and all the judges concurred, except, BRACE, J., who dissented in a most masterful opinion, presenting the same view now avocated by the plaintiff herein, and except BARCLAY, J., who expressed no opinion. Cooley's case follows the prior decisions of this court, and in consequence of that decision, holding the title to islands formed in a river to be vested in the State, the General Assembly passed the Act of 1895 (Acts 1895, p. 207) granting the State's title to the counties within which such islands formed.

This question has again undergone interpretation in the case of McBaine v. Johnson, 155 Mo. 191, and Cooley's case was followed. In McBaine's case it was pointed out that the Supreme Court of the United States in Hardin v. Jordan, 140 U. S. 371, had held that "grants by the United States of its public lands bounded on streams and other waters, made without reservation or restriction, are to be construed, as to their effect, according to the law of the State in which the lands lie. It depends upon the laws of each State to what extent the prerogative of the State to lands under water shall extend." It was further noted in McBaine's case that the Supreme Court of the United States had held in Barney v. Keokuk, 94 U. S. 324, "that it is for the several States themselves to determine this question, and that if they choose to resign to the riparian proprietor rights which belong to them, in their sovereign capacity, it is not for others to raise objections."

The questions must therefore be considered settled in this State by the adjudications of the courts and the legislative acceptance of judicial interpretation.

It follows from these principles that as the land in controversy is not an accretion to the riparian owner's land, but is

an island that sprang up in the river and the accretions which have formed to the island and not to the riparian owner's land, the plaintiff has no title thereto, but the title passed from the government of the United States to the State of Missouri, and from the State of Missouri to Callaway county, under the Act of 1895, and to the defendant by the patent from Callaway county.

For these reasons the judgment of the circuit court is affirmed. All concur, except *Brace, J.*, not sitting.