Paul SIBLEY and Energy Development
Corporation, Respondents,

v.

EAGLE MARINE INDUSTRIES, INC.,
and Chesley Corporation, Appellants.

No. 61638.

Supreme Court of Missouri,
En Banc.

Nov. 12, 1980.

Israel Treiman and Richard R. Vouga,
Clayton, for appellants.

Julius H. Berg and Mark D. Hirschfeld,
Clayton, for respondents.

MORGAN, Judge.

The trial court, in a jury waived case, entered judgment for Paul Sibley and against Chesley Corporation upon Count II of the petition, wherein title to certain real estate was quieted in Paul Sibley; and, thereafter, it was ordered that said judgment would be a final order for purposes of appeal. Jurisdiction was initially in the Court of Appeals, Eastern District, by virtue of Article V, § 3, of the Constitution of Missouri; but, for reasons not now relevant, the cause was transferred prior to opinion by an order of this Court dated September 13, 1979.

The controversy involves real estate, admittedly formed by accretion, immediately south of the confluence of the Mississippi and Meramec rivers and generally known as part of Chesley Island in Jefferson County. Energy Development Corporation and Eagle Marine Industries, Inc. are interested as lessees of the principal parties.

By motion, Sibley asked that Chesley Corporation's brief be stricken and its appeal dismissed for failure to comply with Rule 84.04(c) which requires that: "The statement of facts shall be a fair and concise statement of the facts relevant to the questions presented for determination without argument." Having ordered the motion taken with the case, we now overrule the same although it is obvious that appellants cannot be accused of being too objective.

After five days of trial, involving an untold number of exhibits and some rather complex expert testimony, the trial court filed extensive "Findings and Conclusions" with the judgment entered. Hopefully without destroying the continuity thereof, we quote the following therefrom:

## I.

## THE ISSUES

This severed cause of action, to quiet title in and to certain described real estate lying along the Mississippi River in Jefferson County, Missouri, involves land that has been accreted by the Mississippi River, and the issues raised by the pleadings are, first, whether or not the accretion occurred to the real estate known as "Chesley Island" as accretion to an island which is owned by Defendant Chesley Corporation, and, second, whether or not Defendant Chesley Corporation has a prescriptive right to the contested real estate by way of adverse possession, if it has no other rights by way of accretion.

## II.

## FINDINGS AND CONCLUSIONS

Plaintiffs Paul Sibley, et al., (hereinafter referred to as 'Sibley'), through a series of exhibits numbered 1 through 17, identified the area of conflict between Sibley and Defendant Chesley Corporation, (hereinafter referred to as 'Chesley Corp.'), to be all of the accreted land generally from the "old river bank" to the low water line of the Mississippi River between the north line of the real estate formerly owned by Schaaf (Exhibit 4) and the south line of the original Sibley Tract (Exhibit 7) along or near the southernmost east–west line of U. S. Survey 2005 (see Plaintiff's Exhibit No. 92, Defendants' Exhibit No. F, or Plaintiff's Exhibit No. 18, (Elbring Survey)).

Crucial to the determination of all the issues thus presented, the Court finds from the credible evidence adduced and from the documents received in evidence as exhibits, that Chesley Island ceased to be an island by any definition certainly by 1900 and possibly as early as 1880 (Exhibit 21). Having lost its identity as an island for something between eighty and one hundred years, "Chesley Island" became an appendage to the west bank of the Mississippi River and became a part of the west bank, and the accretions that occurred thereafter along this area of the west bank of the Mississippi River therefore must be judged and determined as all other cases involving riparian rights of landowners (See *Hahn v. Dawson*, 134 Mo. 581, 36 S.W. 233 (1896) and *Conran v. Girvin*, 341 S.W.2d 75 (Mo. banc 1960)).

From all of the hydrographic studies, the river stage reports, the detailed charts, the aerial photographs, as outlined by Plaintiff's Exhibits numbered 19 through 34, 47 through 52, 56, and 58 through 61, together with Defendants' Exhibits M through Z, A–1 through I–1, L–1 through Z–1, A–2, E–2 through I–2 and L–2 through Q–2, the Court finds that the credible evidence adduced illustrated that the process of accretion is continuous and on–going at all river stages from flood to the lowest water mark noted; that accretion is not limited solely to times of high water or flooding and that accretion at every river stage is accelerated by the construction of dikes or fences by the Corps of Engineers.

The Court further finds that the river bank land known as Chesley Island was in fact being eroded by the river, as evidenced by Defendants' Exhibit T (a 1925 aerial photo), and that the subsequent construction of the Corps of Engineer's dikes of 1927 and the dikes noted in the testimony and identified as 'dike 1932 south' and '1932 north' in fact did accelerate the accretion to the west bank of the Mississippi River during both times of high water and low water to create the real estate in controversy in this action.

The finding by the Court from all of the credible evidence adduced, that Chesley Island has not existed as an island since sometime before 1900, is decisive to all of the issues presented. The Court discards as incredible the evidence adduced attempting to equate the occasional run–off of surface waters, or the occasional presence of high water flows as maintaining the identity of Chesley Island as an island, when, in fact, from the exhibits presented and the testimony of eyewitnesses, the old, dead–end Chesley Island slough is sometimes a pond, sometimes an overgrown dry wash and sometimes totally flooded, but it is not a

viable stream nor has it been since before 1900. The traces of run–off channels, particularly as determined by the aerial photograph of 1931 (Exhibit 23) overwhelmingly illustrated that the accretion that occurred since the construction of the dikes in 1927 and 1932 occurred to the west bank of the Mississippi River and did not occur to any "island" which had ceased to exist as such for eighty or more years before.

The Court, therefore, finds that the accretion did not occur to "Chesley Island" but to the west bank of the Mississippi River, and that the Defendant Chesley Corp. does not have any right, title or interest to the contested real estate by accretion. The Chesley Corp. is a riparian landowner, and, as a riparian landowner has no rights superior to any other downstream riparian landowner to lands accreted by the river and, therefore, has no title or color of title to the lands accreted and in controversy here (see *Crandall v. Allen*, 118 Mo. 403, 24 S.W. 172 (1893); *Doebbeling v. Hall*, 310 Mo. 204, 274 S.W. 1049 (1925), and *Pearson v. Heumann*, 294 Mo. 526, 242 S.W. 946 (1922).

The record title of the owners of all of the properties, now owned by Sibley, covering a period of from 1934 through 1974 indicates that those titles as well as the owners themselves considered that they owned, and held themselves out to own, to the river, and possessing riparian rights. Some of the titles included a grant of accretions and some were silent on the issue of accretions, but those that were silent on the issue of accretions indicated in specific language an eastern boundary of the Mississippi River. In Plaintiff's Exhibits numbered 1, 2, 4, 5, 6, 7, 9 10, 11 and 16, all parties, both grantors and grantees, recognized that their properties extended to the Mississippi River and had river frontage, and the Court so finds.

Even in Defendant Chesley Corp.'s deed from the trustees of Brown's Estate (Plaintiff's Exhibit No. 16), accretions are very carefully recited "to the low water line of the Mississippi River," and describes, by purchase, Defendant's determination to buy riparian rights in accreted land lying south of the description of "Chesley Island," and north of the disputed area herein (see Elbring Survey, Defendants' Exhibit No. F). The south line of this carefully defined riparian purchase of accretion land by Defendant Chesley Corp. is also the north line of the property owned by Plaintiff, and is considered and found by the Court to be a most telling admission by Defendant Chesley Corp.

The Court's finding, from all of the evidence adduced and the exhibits of record, that Chesley Island lost its identity as an island from eighty to one hundred years ago also is determinative of the issue presented on adverse possession, as alleged by Defendant Chesley Corp. With the finding by the Court that the accretions occurred to the banks and not to an "island," there could be no notice by way of a color of title to start a period of adverse possession as claimed by Defendant Chesley Corp. Defendant Chesley Corp., therefore, then had to prove actual possession, open and notorious possession, exclusive possession, continuous occupancy for ten years or more and a precise definition of the land claimed. Those items of adverse possession must relate directly to the property in controversy herein and cannot be placed under an umbrella of a color of right by accretion to a non–existent "island." (See *Kirschman v. Cochran*, 241 S.W.2d 9 (Mo.1951); *Benne v. Miller*, 149 Mo. 228, 50 S.W. 824 (1899); *Horton v. Gentry*, 357 Mo. 694, 210 S.W.2d 72 (1948); and *Conran v. Girvin*, 341 S.W.2d 75 (Mo. banc 1960).

Chesley Corp. produced certain documentary evidence on this issue, including Defendants' Exhibit G, a share–cropping farm agreement, which related to land well north of the property in question herein and a timbering agreement, marked Defendants' Exhibit H, which related to timbering operations for large trees on the properties well north of the property in question here. Chesley Corp. also produced unsubstantiated testimony concerning a "contract" with a Lawson Company to cut the small pulp–wood in the general area of the contested

land, an act of possession alleged to have been exercised at sometime prior to 1970, but which was not mentioned by Defendant Chesley Corp.'s answers to Plaintiff's interrogatories numbered 23 and 24 during pretrial discovery.

Even if true, that single possessory act occurring at some time prior to 1970, would not elevate itself into notice of adverse possession or be of such a continuous nature to produce notice of adverse possession to other parties of interest in the realty, without a color of title.

The Court finds that the farm contracts and the timber agreement of record as well as the "Lawson Contract," and the rest of defendant's testimony on this issue, are not sufficient as a matter of law to provide notice of actual possession in a hostile, open and notorious occupancy to illustrate to one and all exclusive and continuous possession of exactly defined realty for a ten–year period. (See *Lossing v. Shull*, 351 Mo. 342, 173 S.W.2d 1 (1943); *Horton v. Gentry*, 210 S.W.2d 72 (Mo.1948); *Frazier v. Shantz Real Estate*, 343 Mo. 861, 123 S.W.2d 124 (1938); and *Conran v. Girvin*, 341 S.W.2d 75 (Mo. banc 1960)).

The only act of ownership on the contested property that was done openly and notoriously to the exclusion of other interested parties occurred some time during 1975, when Defendant Chesley Corp. bulldozed a construction road along the water front of the contested property and constructed "deadmen" (barge docking devices on and along the banks at approximately 750 foot intervals), and entered into a lease with Defendant Eagle Marine Industries, Inc., for the use of the wharfage for barge fleeting purposes. This 1975 intrusion into the contested realty produced a notice from Plaintiff of a wrongful trespass (Plaintiff's Exhibit 93), dated June 18, 1976, slightly

more than one year after notice had been received of the act of possession made by Defendant Chesley Corp. It was not an act of possession that existed for ten years or more.

The Court finds that Defendant Chesley Corp.'s evidence of adverse possession fails to create a prescriptive right in the contested realty as a matter of law.

### III.

### ORDER AND APPORTIONMENT

The Court, therefore, will enter its Order, Judgment and Decree quieting title in and to the contested real estate in the Plaintiff Sibley and further defined as:

> All of that realty held in record title by Plaintiff Sibley together with accretions and bordered on the west by the right of way of the Missouri Pacific Railroad, on the south by the southernmost east–west line of Survey 2005 extended by apportionment eastwardly to the low water line of the Mississippi River; on the east by the low water line of the Mississippi River, and on the north by the south line of Lot One (1) of the Subdivision of the William H. Bell's Sulphur Springs Tract extended from west to east by apportionment to the low water line of the Mississippi River, including all accretions thereto,

and the Court does hereby Order and Decree that Defendant Chesley Corp., nor anyone claiming through it as an assignee, grantee or otherwise, has any right, title or interest whatsoever in or to the real estate and the accretions described herein to the west bank of the Mississippi River.

We review the judgment as entered within the dictates of *Murphy v. Carron*, 536 S.W.2d 30, 32 (Mo. banc 1976);[1] and, for the reasons hereinafter noted, conclude that the same should be affirmed.

1. "Accordingly, appellate 'review * * * as in *suits of an equitable nature*,' as found in Rule 73.01, is construed to mean that the decree or judgment of the trial court will be sustained by the appellate court unless there is no substantial evidence to support it, unless it is against the weight of the evidence, unless it erroneously declares the law, or unless it erroneously applies the law. Appellate courts should exercise the power to set aside a decree or judgment on the ground that it is 'against the weight of the evidence' with caution and with a firm belief that the decree or judgment is wrong. The use of the words *de novo* and *clearly erroneous* is no longer appropriate in appellate review of cases under Rule 73.01."

The law in this state as to "accretion" has been reiterated many times and has remained constant throughout the years. That such is true may be seen from even a casual reading of those cases noted under the caption "Navigable Waters" in Mo.Dig., Vol. 22, under Key No. 44, and representative cases therefrom referred to by the trial court. The parties have not suggested otherwise in their briefs submitted to this Court. Our most recent extensive review of the relevant law may be found in *Conran v. Girvin*, 341 S.W.2d 75 (Mo. banc 1960), wherein, again, accretion was defined as ". . . the increase of riparian land by the gradual deposit, by water, of solid material, whether mud, sand or sediment, so as to cause that to become dry land which was before covered by water." Accretion to an "island" is recognized the same as that to the usual riparian lands along the established banks of a navigable stream. *Moore v. Farmer*, 156 Mo. 33, 56 S.W. 493 (1900); *Dunlap v. Hartman*, 338 S.W.2d 10 (Mo.1960). In this state, a riparian owner along a navigable stream does not own to the middle thereof but only to the water's edge at its low–water mark. *Benson v. Morrow*, 61 Mo. 345 (1875); *Cooley v. Golden*, 117 Mo. 33, 23 S.W. 100 (1893). As reviewed in the *Moore* case, *supra*, the dividing line between lands along the banks of a stream and lands formerly identified as an island is that point at which accretions to either or both come together. *Naylor v. Cox*, 114 Mo. 232, 21 S.W. 589 (1892); *Hahn v. Dawson*, 134 Mo. 581, 36 S.W. 233 (1896); *Doebleling v. Hall*, 310 Mo. 204, 274 S.W. 1049 (1925). Thus, it is possible for what was once riparian land to cease to be such, and the boundary between it and what was once an island is ". . . the last area to be so filled. . . ." *Dudeck v. Ellis*, 399 S.W.2d 80 (Mo.1966). In the *Dudeck* case, at 97, the court emphasized that: ". . . accretions cannot be extended across (1) a well–defined slough of water, *or* (2) an arm of the river carrying running water, *or* (3) a well–defined body of water."

If the trial court was correct in its factual finding that Chesley Island had ceased to exist as an island and had been for many years as other riparian lands along the west bank of the Mississippi River, there are many precedents for the ruling thereafter made. As said in *Crandall v. Allen*, 118 Mo. 403, 24 S.W. 172 (1893), at 174: ". . . it is not true, either in reason or upon authority, that it would enable him, by means of the accretion to his own shore, to appropriate all the alluvion or accretions that formed in front of his neighbor's shore on the same side of the river or water front * * * the authorities are numerous and well considered which scrupulously preserve to each adjoining riparian owner his water boundaries and privileges." See also *Pearson v. Heumann*, 294 Mo. 526, 242 S.W. 946 (1922) and *Widdicombe v. Rosemiller*, 118 F. 295 (1902), wherein the right of a riparian owner to accretion thereto is recognized but limited by the fact he cannot extend laterally so as to exclude other riparian owners above or below him from access to the river.

Was the trial court correct in ruling that this case does not involve an island as such but only conflicting claims by adjoining owners of riparian lands along the west bank of the Mississippi? As heretofore noted, we believe that it was.

Although we have had before us the many exhibits relied on by the parties, certainly the limitations placed upon an appellate opinion proscribe including them herein. Thus, without any effort toward over–simplification, we attach hereto a freehand sketch of the area around which the evidence revolved.

The record title dividing line between the parties is that line running along the south side of Lot 1 of Bell's subdivision and the north side of the Schaaf tract with Chesley owning to the north. It is agreed that Sibley now owns the three tracts marked Schaaf, Hopkins and Sibley to the south edge of Survey No. 2005 plus other acreage further south but not immediately involved.

Paul Sibley testified that he originally purchased the property in 1945 to be on the riverfront and most of the time since that date has made his home there. He testified that there was no slough or body of water

across his property other than at "high water" when the whole area flooded. He explained that the area designated as the "southern slough" (on the attached sketch marked by "x") was, in fact, a low spot on his property and that it did not connect to the "old slough" to the north which terminated north of the old Schaaf tract, and that when water did flow from the old slough it exited into the river north of his property near the north 1932 dike. He further testified: that in 1945 he could walk on his land to the river's edge; that trucks could be driven from the railroad tracks east to the river's edge; and that there was no "island" to the north. His testimony was consistent with that of his wife, who added: that she and her children played on the sandy beach which was the front yard of their property; that there was no creek or water flow behind the accretion that was building up and attaching to their land; and that you could walk from the tracks to the river except during flood time.

Casper Crowe was born on the Sibley property in 1914 and lived in the vicinity all of his life. He testified that the northern portion of Chesley Island was dry most of the time and that he could walk to it without crossing any water. He had worked on the installation of the dikes, which were constructed on dry land, and there was no water between the base of the dikes and the railroad tracks except during floods.

There is apparently no dispute but that in 1899 the Corps of Engineers placed closure structures across the north entrance to the old slough and that the accretions in issue formed after 1927 following placement of the four dikes noted on the sketch—two in 1927 and two in 1932.

The brief of Chesley Corporation seeks to isolate the controlling factual issue. We quote therefrom: "Defendants do not and have never contended that the slough course flows *at all times*, but that it flows only when the Mississippi back up of the Meramec raises the Meramec water level sufficiently to cause flow over the highest part of the slough." Appellant further argues that: "... the trial court believed that the single fact that Chesley Island was not an island required a determination that the accreted land in issue did not form to Defendant Chesley's land. The court erroneously declared or applied the law in so ruling because whether Chesley Island is an island or a part of the Mississippi west bank *it is riparian land* * * * The question to be asked is whether Chesley Island is riparian land, not whether it is an island * * * The only inquiry left is whether the land in issue formed to Defendant Chesley's parcel known as Chesley Island or to Sibley's property ...."

It would seem that appellant's last approach runs contrary to the law recognized, *supra*, in the *Crandell, Pearson* and *Widdicombe* cases, *i. e.*, that a riparian owner cannot claim accretions laterally to the exclusion of a neighbor. If such were not the law, it would not be facetious to suggest that the upstream owner would eventually be the only west bank riparian owner to the mouth of the river.

To the contrary, we agree that the issue as posed by the trial court was correct, *i. e.*, had the island ceased to exist prior to the accretions subsequent to 1927?

Appellant called two expert witnesses and respondent one and most of the briefs are taken in challenging not only the conclusions reached by them but also their qualifications or alleged lack thereof. A review of the same would unnecessarily extend this opinion and would benefit a reader very little. Suffice it to say that what appears to be very scholarly approaches to the problem resulted in expressions favorable to either side. Credibility thereof was for the trial court.

In conclusion, we agree that the issue was one of fact and that there was substantial evidence to support the resolution made thereof by the trial court; and, that the law was applied correctly to the same.

The judgment is affirmed and the cause is remanded for further proceedings, if any, reference the remaining issues reserved at the trial level.

BARDGETT, C. J., DONNELLY, SEILER, WELLIVER and HIGGINS, JJ., and WELBORN, Special Judge, concur.

RENDLEN, J., not sitting.

MERAMEC RIVER 1899

"CHESLEY ISLAND"

OLD SLOUGH

1927 DIKES

MISSISSIPPI RIVER

SOUTH LINE OF NE Q
OF SECTION 16

LOT 1,
BELL SUBD.

MISSOURI PACIFIC RAILWAY

ACCRETIONS

ALL NOW OWNED
BY SIBLEY →

SCHAAF

HOPKINS

1932 DIKES

SURVEY 2009
SURVEY 2005
SIBLEY

CONTESTED LAND

"WATER COURSE"
(?)

(X)

ROCK CREEK

NOT TO SCALE