Earl R. DUDECK, Robert Dudeck and William E. Courter, Daisy B. Courter, Plaintiffs, Respondents,

v.

LeRoy ELLIS, Defendant and Third-Party Plaintiff, Appellant,

v.

Pearl W. and Dorothy SCHWEIZER, Raymond G. and Ruth Schweizer, and Calvin W. and Rita Schweizer, Third-Party Defendants, Respondents.

No. 51166.

Supreme Court of Missouri, Division No. 1.

Jan. 10, 1966.

Downs & Pierce, St. Joseph, for respondents Earl R. Dudeck and Robert Dudeck.

Price Shoemaker and William L. Culver, St. Joseph, for William E. Courter and Daisy B. Courter.

Randolph & Randolph, by Lewis F. Randolph, St. Joseph, for appellant.

Ronald S. Reed, Reed & Reed, St. Joseph, for respondents, Pearl W. and Dorothy Schweizer, Raymond G. and Ruth Schweizer, and Calvin W. and Rita Schweizer.

HIGGINS, Commissioner.

Earl R. Dudeck, Robert Dudeck, Winifred Maude Bledsoe, William E. Courter, and Daisy B. Courter brought an action against LeRoy Ellis to quiet title to certain lands and in ejectment; Ellis cross petitioned to quiet title to a part of such lands and, as third-party plaintiff, brought an action against Pearl W. and Dorothy Schweizer, Raymond G. and Ruth Schweizer, and Calvin W. and Rita Schweizer to quiet title to certain other lands, to which Schweizers cross petitioned against Ellis to quiet title in them. The quiet title issues were tried to a jury and Ellis appealed from a judgment against him on those matters and, in a prior opinion, we determined jurisdiction to be in this court in that "A part of the action directly involves title to * * * real estate," but dismissed the appeal as premature because "No verdicts were returned on the ejectment counts and they are not disposed of by the judgment presented on appeal." Dudeck v. Ellis, Mo., 376 S.W.2d 197, 204 [4].

In our previous opinion we said: "* * * the trial judge should have held the verdicts of the jury on the quiet title counts in abeyance until a final judgment could be entered disposing of the whole case, including the other counts stating causes of action." 376 S.W.2d 1. c. 204 [4]. After the appeal was dismissed the trial court sustained motions for summary judgment on behalf of Dudeck, et al., and Schweizers, and entered judgments against Ellis disposing of the remaining counts. Ellis has duly appealed from the last entry disposing of all counts and respond-

ents' motions to dismiss the appeal are over-ruled.

Inasmuch as the previous opinion did not reach the merits, we will make another statement of the case.

Dudeck, et al., filed their first pleading against Ellis May 4, 1956, but went to trial on an amended petition in ejectment and to quiet title filed December 8, 1960. They alleged generally that they owned certain adjoining tracts of land in Buchanan County, Missouri, with record title and possession; that Ellis claimed an adjoining tract under a patent from Buchanan County; that he wrongfully claimed and occupied lands owned by plaintiffs because the lands so claimed by Ellis belonged to plaintiffs by accretion through action of the Missouri River. In Count I Dudecks stated their claim against Ellis in ejectment and damages for withholding possession in respect to a specifically described 16-acre tract; Count II (stricken during trial) was for damages for cutting trees; and Count III was to quiet title to the 16-acre tract described in Count I. Winifred Maude Bledsoe stated her cause of action against Ellis in Count IV for ejectment and damages in respect to a specifically described 15-acre tract in Buchanan County, Missouri, and in Count V to quiet title to said tract. Count VI was Courters' claim in ejectment and damages in respect to 11-acre and 2-acre specifically described tracts in Buchanan County, Missouri; and by Count VII they sought to quiet title to said tracts.

Ellis alleged in his amended answer that he was the owner of 215.04 acres, more or less, of specifically described land in Buchanan County, Missouri, and that he acquired same from Buchanan County, Missouri, by patent issued and recorded October 14, 1940; that the claimed land formed as an island in the former bed of the Missouri River, or by recession from and abandonment of the bed of said river, and that it had been surveyed and sold to him for the benefit of the county school fund; that by the process of reliction an area of land was added to his alleged island between its south shore and the former south high bank of the river, and that the area had been a slough through which river water ran which filled with sediment and dirt as a result of pilings placed in the area by the United States Corps of Engineers. He claimed to own to the center of the slough and described his claim in his counterclaim and cross petition. He pleaded further that the main channel of the Missouri River ran along the west side of his land for many years but the river gradually receded northward and in the process land was added to the north side of his land by accretion which extended to the south shore line of the river; that in 1952 the Corps of Engineers changed the river so that it no longer flowed along the north and west side of his land but flowed directly south at a point "considerably east" of his land; that after the change an area of land was added by reliction which extended to the center of the former riverbed as it existed before being cut off and that he then owned all land north and west of his original island. In addition, he denied the other claims made in the petition and suggested that some of the plaintiffs' lands may have washed into the river.

Ellis subsequently filed a first amended cross claim against plaintiffs and, as a third-party plaintiff, stated a claim against Arlene F. DuPont and Eva L. Graski (who defaulted), heirs of Winifred Bledsoe, a deceased plaintiff. By this pleading he sought to quiet title to "Tract No. 1," being the land mentioned in his answer which he claimed under patent from Buchanan County and now by adverse possession. He also claimed to have expended $20,000 in clearing and improving the land which he alleged he was entitled to recover if dispossessed of the land. He also sought to quiet title to "Tract No. 2" being the land lying between the original south shoreline and the former high bank mentioned in his answer which he claimed by reliction. Ex-

hibit A to his pleading purported to be metes and bounds descriptions of Tracts 1 and 2.

Still later Ellis, as third-party plaintiff, cross claimed against the Schweizers and one James Muff (who defaulted) to quiet title to Tracts 1 and 2. He again described his claim as first stated in his answer. He also cross claimed in ejectment for possession of Tracts 1 and 2 and prayed also for damages, rents and profits, and by a second count he claimed damage for trespass alleging that Schweizers entered upon said land and removed survey stakes on the southern boundary of Tract 2 and that they had plowed up some wheat.

Schweizers subsequently filed answer and counterclaim to Ellis's third-party cross claim in which they denied the cross petition and counterclaimed to quiet title to specifically described land lying between their property on the south and the south line of the alleged island. They alleged that their described property formerly abutted the Missouri River and that over a period of years accretions formed and were added to the tract and became a part of the tract and that they owned both the land and the accretions to it. They alleged also that the accretions consisted in part of Tract 2 described in Ellis's pleadings. Their answer also denied Ellis's claim against them in ejectment and trespass.

Ellis answered Schweizers' pleading by denying their claim to accretions (Tract 2), and he stated that he "makes no claim of ownership to any of the land in Section Three (3) Township Fifty-seven (57) Range Thirty-six (36), lying east and south of the former high bank of the Missouri River." He also stated that Schweizers own the south half of Tract 2 "if they own the high bank land."

This dispute involves ownership of land in Sections 2 and 3, Township 57, Range 36, Buchanan County, Missouri, which is a part of French Bottom northwest of St. Joseph and its airport, Rosecrans Field. The center of Section 2 is the southeast corner of the Courter property which, together with the Dudeck land, was originally acquired in 1901 and 1903 by Otto Dudeck, father of the Dudeck brothers and Mrs. Courter. The present title was established upon the death of Mrs. Otto Dudeck in 1953. The Bledsoe tract lies between the Dudeck and Courter tracts and all three faced north upon the south bank of the river. The Bledsoe tract is not in controversy here because of an unappealed judgment against that ownership. The land in issue between Ellis and Schweizers lies west of, but not adjoining, the Dudeck land. The evidence shows that prior to 1915 the Missouri River ran generally from northeast to southwest by these lands and was eroding its south bank to the extent that land was being washed into the river. At this time the river flowed along the north side of plaintiffs' land and the bank there was referred to as "the 1915 high bank" or "second high bank." Such bank appears as a dark line of trees on a 1940 aerial photograph in evidence. In order to prevent continued erosion in the area the Corps of Engineers in 1933 and 1934 constructed five push dikes and two trail dikes which extended from the 1915 high bank out into the main channel of the river. The push dikes were somewhat perpendicular to the bank and were used to push the current away from the south shore. The trail dikes were constructed north and south of the push dikes and they ran somewhat parallel to the shore or bank. As a result, the main channel moved to the north to a point where a new high bank was created. In 1952 the river was diverted by the Corps to a new channel east of the series of dikes, and portions of the bed of the river as it existed in 1952 became exposed.

Ellis purchased his alleged island from Buchanan County in September 1940. It was stated to lie to the north of the 1915 high bank of the river and was described as being of a crescent shape with its outside curve to the north with one end pointing east, the other to the south, and the

inside curve conforming generally to the 1915 high bank and at varying distances from the bank. The area of some twenty-five to thirty acres between the metes and bounds description of the island and the 1915 high bank was not sold by the county.

The deeds by which Dudecks and Courters inherited their properties contained a legal description of land, some of which went into the river prior to the Corps' bank stabilization program, but they claimed to own the area within their deed descriptions together with accretions. Similarly, Schweizers claimed the land between the 1915 high bank and the south line of the Ellis island as it was described in his patent from the county.

In this posture it is apparent that the case turned on the question of how the disputed land was formed, i.e., if it was at one time completely surrounded by water in the channel of the river at its low watermark, and thereafter grew until it attached to the 1915 high bank with only a slough between that carried water only when the river was high, then the disputed lands claimed by Ellis belong to him; if, on the other hand, the disputed areas were formed by accretions to plaintiffs' and Schweizers' 1915 high bank, then the disputed areas belong to plaintiffs and Schweizers. The parties ultimately submitted their respective theories for the resolution of this issue to the jury, and several witnesses testified to additional matters affecting such resolution.

Roderick Riddle, a civil engineer in St. Joseph, Missouri, identified several exhibits upon which he indicated the lands owned and claimed by the parties and the dikes constructed along the 1915 high bank. Exhibit 1 was a 1953 plat of survey of plaintiffs' lands prepared by his company showing the 1915 high bank and the 1952 bank as it lay further north prior to the river cutoff of 1952. There was no water on the land between the two banks, and he pointed out a gut or slough of water running through the island area *west* of the west line of any of plaintiffs' property. He identified an area in the river to the north of the Dudeck property and between the area of the two trail dikes which in 1931 had as much as 400 feet of running water at one place between it and the bank. The water was as much as 16 feet deep at that time which was during the period when the river was cutting the south bank and prior to the dike construction. The witness ran a survey for Ellis in 1959 and he noticed then that the land in dispute between Ellis and Schweizers was highest at the mainland or bank side and lowest at Ellis's south line slightly downstream where he drove stakes to mark the line between those parties. Ellis had been farming only to that line. He stated that the new land formed by accretion from the south or the high bank out into the river rather than from the Ellis land back to the bank. As to what happens when dikes are constructed as in this case, Mr. Riddle testified:

"Q When dikes such as shown * * * are put in here, does that have any effect on changing the channel? A Yes. Q What is that effect? A In a case of trail dikes, the push dikes tend to push the channel beyond the ends of these dikes.

"Q In the process of doing that, * * * does it also build up land against the old bank? * * * A When push dikes and trail dikes are put in, * * * they build ground from the bank out * * *."

Mr. Riddle also testified that on September 8 and October 10, 1940, there was no body of land completely surrounded by water north of the Dudeck property, and that at low water stages sandbars appear and disappear in the river.

George C. Eblen, surveyor for the Corps of Engineers, with 36 or 37 years of experience, testified that the 1940 aerial photograph showed no water along the north line of the Dudeck property in the area of the north trail dike. In respect to the dikes he testified:

"Q The result intended is to build up land from the bank on out and at least to

the end of the dikes? A Yes sir. * * * Q That was the purpose of putting dikes in this particular area to build up land along that particular bank? A Yes."

In respect to sandbars he testified: "Q You have stated to the jury that along this area in dispute there are dikes in the shaded area and this area indicates sand to you? A On the dates (1936) of these maps. Q Does that sand extend up to the high bank you have testified about? A Yes, from this gut right here. Q Would that indicate any island or anything else there at that particular time? A Not on the date the map was made."

This witness also identified a chute west of the Dudeck property running southward through the Ellis property and then to the west.

William E. Courter, aged 69, testified that the river took a portion of the original Dudeck-Bledsoe-Courter holding around 1915 and that some dikes were put in at that time which ran out to the north from the bank. The river then began to fill in at the bank and pushed the water out, and this action continued after the 1933–1934 dikes were put in. By 1940 the land north of the 1915 bank had grown up in willows and cottonwoods. According to him, the only gut or slough was west of his property; there was no gut or slough behind the land, and no island out to the north. He estimated that Ellis was encroaching on Dudeck land with his farming to the extent of at least five acres. He claimed land north of the 1915 high bank because "it started at the high bank and built out." Similar land built out from the high bank on Schweizers' land. The Dudeck family had paid taxes for over sixty years on the land described in their deeds irrespective of gains and losses due to the action of the river. Mr. Courter stated that he had not farmed any of the made land and acknowledged seeing Ellis doing some clearing.

Earl R. Dudeck was born out in French Bottom in 1894. He testified: "Q What happened in 1915? A The river started cutting and it cut back to what you call the first high bank now. * * * Q What happened after 1915 * * * ? A Well, yes, the Government came in there and put some river work along there—the dikes down the river. Q The river continued to flow along there until the early 30's? * * * A It started in 1915 and stayed there until, I would say, I am pretty sure those dikes were started in 1934 when those first dikes were put in—I absolutely know for I worked on them myself. That river stayed there until they put the dikes in in 1934 or thereabouts. Q What happened in 1934 when the dikes were put in? A They put the dikes in there to form accretions and put the river back out in the channel of the river and keep it from cutting. * * * Q What happened to your ground at that time? A It started filling in right next to the bank. You could go out today and sand was right here, and maybe the next day or in a couple of days, you could go out and this was all bar. It gradually kept filling in day in and day out."

In 1952 the river flooded and cut about four acres off the Dudeck place and cut even more off the Watkins and Schweizer lands on the west and the Courter and Bledsoe lands on the east. According to him, there was never an island out north of his land.

Homer L. Lowe, a retired Corps of Engineers cartographer, testified that exhibits in evidence showed bars separated from the mainland by water in 1931–34. As to how land forms around dikes he testified: "Normally in a large majority of cases, it forms behind the dikes and the first formation occurs downstream from the dike and approximately midway between the bank line and the end of the dike. There will be a certain amount of water that switches around the end of the dike and comes downstream side of the dike and goes along the bank line, or what we call a chute. This first fills back of the dike normally, sits out there by itself downstream from the dike midway from the bank line and the outer end of the dike. Q Where does this first

fill generally take place? A This fill is always downstream from the dike itself. Q If you have a series of dikes as in this instance, would you expect the first fill further downstream? A Normally. You get your first fill at the upper end of the system. Q It fills behind the respective dike further down the river? A You usually built the upstream dike first—they have been in longer and that is why it normally fills in there first."

This witness characterized a plat of the island as "not fair," and that lines purportedly shown by it would not be as accurate as the aerial photograph. He was asked if the dikes were built in 1933–34, "then this island we are talking about could not have resulted back in 1931 from these dikes, could it? A No, not from these dikes." He recognized that the revetments had been covered between 1936 and 1940, and that such cover would be accretions unless artificially done by machine. He stated also that water passing through a chute caused land to build equally on each side of the chute when the water level went down. As to the area disputed by Ellis and Schweizer, he stated that the ground south of the chute built against the bank.

Charley Hart stated that he was a commercial fisherman in the 30's and fished in Belmont Bend. He fished with hoop nets which required six feet of water to float and had put such nets in a chute between an island and the mainland near where Ellis now farms. Water was running in the chute when he quit fishing in 1939 and he took his boat out over the dikes at the east end of the chute. The chute had a high bank eight to ten feet high.

Chris F. Hessler, aged 74, went along Belmont Bend in a boat in 1927, a time when the river was cutting the south bank. In 1939 he observed a bar with a strip of water 60 to 250 feet in width running between it and the bank. He knew everyone in French Bottom at one time and, while campaigning for assessor in 1940, learned that the county was going to sell an island. He estimated it to contain 150 to 250 acres.

E. N. (Nate) Peterson, a real estate man for 45 years around St. Joseph, also heard of an island sale. He went to the island to look it over for purchase twice in the summer of 1940 and saw water running in a chute along the south side of it.

Robert Cox remembered when the dikes were put in, and he also had fished a slough south of an island. He fished for four years after the dikes were put in during which water was running between the dikes. According to him, the slough filled in from the head or east end first but not from the high bank. He did not know when the slough filled.

Charles Jaquet operated a sand boat in the area beginning in 1927. In 1916 he had been there on a government boat doing levee work and saw the river cutting the left (south) bank. The river cut a quarter of a mile or more with a main channel running along the left bank. He was on a boat which the pilot let get dead against the straight-out dike and some of the crew walked out on the dike. According to him, bars formed after the dikes were put in leaving a gut between them and the bank.

William Liechti had lived on a hill overlooking Belmont Bend on the Kansas side since 1918. He observed the cutting done by the river and recalled the dikes being constructed. The water continued to run along the bank for about a year and then a sandbar formed. According to him there was water in the slough between it and the bank until after the 1952 flood. The bar gradually came in.

Henry J. Hanke testified by deposition that he was familiar with the river. In 1934 he helped repair the second dike from the west and at that time there was a 15 to 20-foot bank all along the area. He also fished the area but "after the dikes were put in and throwed that bar out there, I

didn't fish." According to him, the bar formed at the north end of the dikes and never extended to the high bank. There was a slough between the bar and the bank as late as 1939. He stated that sloughs fill first where the water comes in, and that this slough filled from the east end first.

Donald Carson lived in the Courter house in 1939 and went fishing on a bar north of the high bank which he reached by walking pilings. There were about 40 feet of water with a current. According to him, the bar had begun to form behind Dudeck property in 1936.

LeRoy Ellis testified that he first became acquainted with the island in August 1940. He went there and walked north to the former high bank of the river and found running water in a slough over the high bank. He walked east 200 to 250 feet to dike No. 4 which he walked and water ran underneath it. He crossed about 100 feet of water. He stepped off on the bar and walked around the island following a slough. The land was completely surrounded by water. After he got his patent he purchased a roadway through Schweizers' land from the previous owner Freymann. He went into service March 1941 and next saw the island in June 1943. The slough had filled quite a bit. He next saw the bar in August 1944. There was no water in the slough but it was muddy by the high bank. He was there again in November or December 1945 and the bar was building up. He started clearing the bar in the summer or fall of 1947 and he cleared all the land except to the middle of the slough and on the north side. His Exhibit 21 showed the Schweizer land and a small portion of Dudeck land which he said he cleared. He identified a series of pictures showing water in the slough area, the high bank and fill deposits. He has paid all taxes on the land since he bought it. Mr. Ellis has not had a surveyor or engineer to survey the land. Mr. Riddle, pursuant to instructions, made a plat of the lines run by Deputy Surveyor Chiaborel in preparing the patent. Mr.

Ellis claimed that accretions built from his island toward the high bank. He never possessed nor claimed any Schweizer land prior to his suit against them. Roderick Riddle could not run the line of the high bank because it had been somewhat obliterated by some bulldozing done by Mr. Keller, a predecessor of Schweizers.

Ellis Cogdill lived in French Bottom in 1943 and previously in 1910–1917. He said that the river cut the south bank around 1915, cutting it back as much as one half to three fourths of a mile south, and that the bank along what became Schweizers' place was about 15 feet high with current running along it. After the dikes were built in 1934 the high bank went out to the west and the land filled in with vegetation ultimately growing there. The largest willows grew next to the bank. In respect to how the land formed the witness said: "When the river made the bend and came back where I farmed in 1942–1943, when I farmed this big high bank with the willows and cottonwoods was down there. I don't remember any water between it until you got further down making part of the old river bed going south. Q The river was on the south side by the high bank and willows and cottonwoods? A The way I see it. Q That same situation prevailed all the way up? A No, a little different. Q Tell us about that? A All I know, it gradually built back from the second bank out."

Homer Cogdill testified that after the dikes were in land built up to the high bank on the west of Freymann's property which joins Schweizers on the east. During the period from 1922–23 to when the dikes were put in the river was cutting south and current ran along the bank. There was no current after 1936 but "there was a slough —dead water."

H. Keller stated by deposition that he owned the Schweizer land from 1946 to 1956 when he sold it to them. He said there was no slough in the disputed area in 1946 but that the land sloped off from

the high bank to a ditch on the west side of the farm which followed the Ellis line rather than the high bank. According to Keller, Ellis had a survey of his line run upon which he placed stakes and stated that Keller owned the land south of the stakes. The land south of the stakes was higher than Ellis's land. No water ran along the high bank in 1946–1952 but a little ran in the ditch during high water. Ellis voluntarily helped Keller clear the land in controversy claimed by Schweizers, and Keller repaid him with some plowing. By 1955 the entire area up to Ellis's stakes had been cleared and was under cultivation. Ellis never farmed south of the stakes and Schweizers understood the stakes to be the boundary between them and Ellis.

Jennie Keller stated that the land she and her husband purchased was covered with trees and brush when they bought it. There was no water standing near the high bank. She corroborated her husband's testimony in respect to the area cleared and farmed by her husband.

Tom Hutchison farmed land adjoining the Schweizer land in 1942 and 1943. He stated that the land sloped from the high bank out to the chute and that during that time water stood in a gut across Ellis's land.

Jim Muff had lived in the area all his life and helped farm the land owned by Schweizers. In 1942 the land sloped from the high bank out to the chute. He worked on the dikes and said that after they were constructed water no longer ran along the high bank. In 1944 he drove a team out to Ellis's land and no water was then around it. He saw Ellis's stakes which were along some low places and the slope was upward back to the high bank. He characterized the low spot by Ellis's stakes as a slough. Water ran behind Schweizers until about 1936–1937 and not quite so long behind Dudecks and Courters. The fill was practically even toward the high bank.

Pearl Schweizer stated that when they bought the land from Keller in 1956 there was a small depression along Ellis's stakes and the stakes followed the depression. Ellis never complained to Schweizers about their farming the disputed area until this suit was brought and it was conceded that Schweizers and their predecessors had farmed the land south of the Ellis land.

A stipulation whereby plaintiff Joseph Heater dismissed his petition and Ellis was authorized to proceed with his counterclaim against Heater by default resulted in a decree quieting title in Ellis to certain land in Section 2, Township 57, Range 36.

The court directed a verdict for Ellis on Dudecks' claim for damages, and on Ellis's claim to Tract 1, the court directed a verdict against Schweizers and decreed title in Ellis to all that portion of land described in the island patent which lay west of the east line of Section 3, Township 57 North, Range 36 West.

The case was then submitted to a jury under written instructions and verdicts were returned on forms submitted as follows:

"(1) Earl R. Dudeck, Robert Dudeck, William E. Courter & Daisy B. Courter, Plaintiffs, vs. LeRoy Ellis, Defendant. We * * * find the issues in favor of Earl R. Dudeck, Robert Dudeck, William E. Courter and Daisy B. Courter, upon their Petition.

"We further find for Earl R. Dudeck, Robert Dudeck, William E. Courter and Daisy B. Courter, and against LeRoy Ellis on his counterclaim. * * *

"(2) LeRoy Ellis, Third Party Plaintiff, vs. Pearl W. Schweizer and Dorothy Schweizer, his wife, R. G. Schweizer and Ruth Schweizer, his wife, and C. W. Schweizer and Rita Schweizer, his wife, Third Party Defendants. We * * * find for the third party defendants, Schweizers, on their counterclaim to quiet title against Ellis, and against third party Ellis on said counterclaim. * * *

"(3) [Same caption as (2)]. We * * * find for the third party defendants,

Schweizers, on third party plaintiff Ellis' action * * *."

Pursuant to these verdicts the court entered judgment which vested title in Earl R. Dudeck and Robert Dudeck to certain particularly described land in Section 2, Township 57, Range 36, extending "to the existing high bank of the Missouri River prior to the 1952 cutoff"; vested title in William E. Courter and Daisy B. Courter to certain described land in Section 2, Township 57, Range 36, also extending to the 1952 high bank of the Missouri River; vested title in Schweizers to certain described land in Section 3, Township 57, Range 36; quieted title against LeRoy Ellis in respect to all said tracts and decreed that he had no lien or interest in said tracts, and denied his counts against Schweizers in quiet title, ejectment, and trespass. Costs were taxed against Ellis.

As previously stated, this entry was held (376 S.W.2d l. c. 204 [4]) not to constitute a final appealable judgment and the appeal from it was dismissed. Following our dismissal there were further proceedings in the trial court on motions for summary judgment under Civil Rule 74.04, V.A.M.R., filed by Schweizers and Dudecks and Courters. The motions were alike in that they contained allegations to the effect there was no genuine issue as to any material fact and that the movants were entitled to judgment in ejectment and trespass as a matter of law. Both motions were supported by affidavits of personal knowledge to the same effect and the adverse party, Ellis, did not respond by counteraffidavit or otherwise as provided by the rule. The court sustained both motions, and entered, as a part of the original judgment, judgments against Ellis and in favor of Schweizers on Ellis's claims of ejectment and trespass and against Ellis and in favor of Dudecks and Courters on their claims against Ellis in ejectment for possession of certain lands. Ellis's motion for new trial was overruled and this appeal followed.

Appellant first contends that this action was barred by the 10-year statute of limitations, Section 516.010, V.A.M.S., because it accrued to plaintiffs' predecessor, Otto Dudeck, when Ellis recorded his patent October 14, 1940, and was not instituted until May 4, 1956. Appellant relies on Sections 442.380 and 442.390, V.A.M.S., requiring real estate deeds to be recorded and providing that recordation imparts notice of the contents of such instrument, Brown v. Evans, Mo., 182 S.W.2d 580, 582 [2]. He argues that the statute began to run against Otto Dudeck from the time he recorded his patent on October 14, 1940, Smelser v. Meier, 271 Mo. 178, 196 S.W. 22, 25 [4], Hunter v. Hunter, Mo., 237 S.W.2d 100, 103 [4], and that a title undisturbed for such a time should not be easily disturbed, Tichenor v. Bowman, Mo., 133 S.W.2d 324, 326 [4], Williams v. Keef, 241 Mo. 366, 145 S.W. 425, 427 [3].

■ Appellant's contention disregards the condition of the land in question. The evidence was that although appellant recorded a patent October 14, 1940, and visited the land a few times, he did not go into possession of any land until late summer and early fall, 1947, when he did some clearing. The land had not been cultivated, and clearing was necessary to use and possession because the land was covered with vegetation consisting of cottonwoods, willows, vines, and weeds. Some of the trees were as large as six or seven inches in diameter and the land itself was rough. Under these circumstances the land in question was wild land and the 10-year statute of limitations would not commence running against plaintiffs' cause of action until Ellis began acts of actual possession in the summer of 1947; plaintiffs' suit accrued with those acts and it was commenced within ten years of that time. Kline v. Groeschner, 280 Mo. 599, 219 S.W.2d 648, 649, 651 [7, 8]; Conran v. Girvin, Mo., 341 S.W.2d 75, 90–91 [16–20]. Cases cited supra by appellant, Hunter v. Hunter and Smelser v. Meier, are not in point because they did not involve wild land and the possession there

relied upon was obviously known, actual, visible, exclusive, hostile, and continuous for more than ten years prior to the attempt to overcome the bar of the statute.

Appellant contends next that the court erred in giving Instructions Nos. 9, 10, 11, 12, 13, and 16 on behalf of Schweizers because they are "all on the question of reliction, recession and accretion, repeating the doctrine over and over again six times, and tend to unduly emphasize that phase of the case, and * * * contain misstatements and misdirections as to the law, so as to confuse and mislead the jury."

We note first that appellant does not contend there to be insufficient evidence to justify giving the instructions questioned by this point. In respect to his controversy with Schweizers, Ellis's theory is contained in Instructions Nos. 1, 7, 14, and 15. Instruction No. 1 said in part: "The Court instructs the jury that * * * if you believe and find from the evidence * * * that the area in Tract number II * * * was formerly part of a slough or arm of the river, through which the river water ran at the lowest ordinary stage of the river, and that part of said slough or arm of the river * * * was between the south shore line of said tract number 1 (the island), and the former high bank of the river along the * * * Schweizer land * * *, and that said slough or arm of the river, as the result of high water or floods, finally filled in with dirt and silt carried by the waters of the river, filling in from each side until it became usable land, then Ellis became and was the owner of the land if any, that was so formed in said former slough or arm of the river, if any, to the center of said former slough or arm of the river between the south line of said tract number 1, and the center line of said slough or arm of the river, and Schweizers * * * became and are the owners of the land in said former slough or arm of the river lying between the former high bank of the river along their land, extending north to the center line of said former slough or arm

of the river, to which land Ellis makes no claim * * *.

"If you find the facts with reference to the formation of tracts number 1 and 2, as in this instruction stated, then your verdict will be for Ellis and against * * * Schweizers for said tracts * * *, provided you further find and believe * * * that the land between * * * Schweizers' high bank land and the south shore line of tract number 1, did not form as an accretion to by building out north from the former high bank of the river along * * * Schweizer land to the south shore line of tract number 1 * * *." His Instruction No. 7 said: "* * * The issue for you to determine between Schweizer and Ellis is, did * * * tract number 2, north of the Schweizer land, form by reliction and filling in, or was it part of an accretion to the high bank land of the Schweizers"; "reliction" was defined in Instruction No. 14 as "an increase of land by the withdrawal or retrocession of the river or water, or the filling in of the land by flooding in high water"; and Instruction No. 15 stated: "* * * the burden of proving that the land in controversy between LeRoy Ellis and defendants Schweizer formed by accretion to the shore line of the Schweizer land * * * is upon the defendants Schweizers."

Instruction No. 9 said that before the jury can find for Ellis and against Schweizers on Ellis's petition, "the jury must find that the land in controversy * * * between said parties filled up from the bottom or by deposits within its bed, and * * * that said land * * * did not form on one side or the other of the land lying between the old high bank and the land owned by Ellis." The instruction controverts Ellis's theory of recovery submitted in Instruction No. 1 and tells the jury that it cannot find for Ellis on his theory if the land in issue formed by accretion to the Schweizer high bank or to the land which lay between the high bank and the island (Tract 1). It does not deprive Ellis of any

land formed to his side of the slough if any such land formed in the manner described by his theory in Instruction No. 1, and it is not in conflict with Instruction No. 11 which states that "adjacent owners of the mainland and of the island are entitled to the land made to their respective lands by accretions and the recession of the river, and where the shorelines of two tracts * * *, divided by a water course or slough, received accretions or relictions until they came together, the line of contact will then be the division line." Instructions Nos. 9 and 11 are not subject to a charge of conflict because they are consistent with what happens when accretions or relictions occur to both the properties previously separated by a slough or arm of water and to the situation where the accretions and relictions occur to but one of such sides or properties.

■ Appellant does not attack Instruction No. 10 beyond the general charge of repetition and misdirection, but it told the jury that Ellis conceded that Schweizers owned all land south of the tract in controversy and the south half of such controverted tract. It then proceeded with Schweizers' theory of defense to Ellis's petition and told the jury that if it "find * * * that the north one-half of the land lying between the old high bank * * * on the south and the south line of the tract * * * acquired by Ellis (island) was made to and against the tract * * * owned by the Schweizers by the gradual and imperceptible deposit of earth, sand and sediment against the Schweizers' land, such deposits resulting from the action of the water in the river, or to land formed by accretion or recession to Schweizers land, or if you find that the north one-half * * * was added to said land so owned by the Schweizers by the retreat and recession of the river from their said land, or to land made thereto, or in part by both such accretion and recession, then your verdict must be for the Schweizers * * *." Such instruction is a correct statement of

the law of this case, Cullen v. Johnson, 325 Mo. 253, 29 S.W.2d 39, 46–47 [7–10]; and it is not subject to appellant's charges of misstatement, misdirection, confusion, and of being misleading.

■ In addition to that part of Instruction No. 11 set out above, the instruction proceeds to tell the jury that "if they find * * * that the land in controversy between Ellis and the Schweizers was formed by accretions to the old high bank of the river * * *, or was formed by the gradual recession of the waters of the river from said old high bank * * * or was formed to said old high bank by both such accretions and such recession of the waters * * *, then your verdict must be in favor of the Schweizers * * *." Appellant concedes that the portion of Instruction 11 previously set out contains a correct statement of the law, but he says the vice is in the part now set out, charging that it submits the proposition "of recession from the *old high bank,* but ignores the recession on the *other side of the slough.*" Clearly, appellant seeks to inject something into the latter part of the instruction that is not there. It does not mention either side or bank of the slough but confines itself to Schweizers' theory that if the land in controversy formed to the Schweizer high bank land by either accretion or recession, then such land belongs to Schweizers and not to Ellis. The instruction contains a proper legal theory for Schweizers to advance; it is supported by the cases, e. g., Buse v. Russell, 86 Mo. 209, Conran v. Girvin, supra; Hauber v. Gentry, Mo., 215 S.W. 2d 754, Gaskill v. Cook, Mo., 315 S.W.2d 747, Peterson v. City of St. Joseph, 348 Mo. 954, 156 S.W.2d 691, and is thus not subject to appellant's charge of misdirection and misstatement.

■ As in the case of Instruction No. 10, appellant makes no specific charge against Instruction No. 12; however, it also is not misdirection or misstatement in that it properly told the jury that if it found a "low

place or slough" existed on the land in question through which water may have passed in time of overflow and high water, it would still find for Schweizers if the land in controversy was "made to and against the lands owned by the Schweizers, or to land made to said land so owned by the Schweizers." Peterson v. City of St. Joseph, supra, 1. c. 694 [6].

■ Instruction No. 13 is Schweizers' theory of recovery on their counterclaim. It tells the jury that Schweizers' ownership of land situate on the old high bank of the Missouri River and their claim to the south half of the land lying between the old high bank and the tract obtained by Ellis from Buchanan County are conceded by Ellis. It further instructs "that if you find * * * from the evidence that the north one-half of the tract lying between the old high bank and the south line of the Ellis tract as described in his patent * * * was made to and against the Schweizers owned land, or land which had been made to and against the old high bank of the river * * * by the gradual and imperceptible deposit of earth, sand and sediment accreting to said bank * * *, or was added to said land by the gradual recession of the river from said land * * *, or both such accretion and recession, * * * then your verdict on Schweizers counterclaim to quiet title to said land in controversy against Ellis must be in favor of Schweizers * * *." This is a proper theory for Schweizers to advance for their own recovery as was Instruction No. 11 by way of a defense to Ellis's petition, and it is neither misdirection nor misstatement because the theory of the instruction has been previously approved by this court. Minton v. Steele, 125 Mo. 181, 28 S.W. 746; Chinn v. Naylor, 182 Mo. 583, 81 S.W. 1109.

Appellant says that Instruction No. 13 contains the same vice charged against Instruction No. 11 in that the language "or was added to said land by the gradual recession of the river" again ignores reces-

sion of the river from his side of the slough. Such is obviously not the theory of the instruction and what we said in discussing Instruction No. 11 rules the same contention here.

■ Instruction No. 16 defined accretion and reliction, told the jury that land formed by either process or by both belonged to the owner of the land against which they formed, and told the jury further "that land may form in the bed of the river by gradual deposits of soil, sediment and sand, or by the gradual recession or drying up of the * * * river or of an arm or branch thereof, and in such event may not form against higher ground owned by a person whose land extends to the waters edge at ordinary low mark." Appellant says again, "The vice of this instruction is, that it assumes that the water recedes or dries up on one side of the slough only." We are not able to read into this instruction such an interpretation or impression. It is at most definitive of terms, accretion and reliction, and of a situation, the gradual build-up of or recession from a stream bed, as opposed to accretions. The quoted portion defining the situation of gradual build-up or recession is not inconsistent with the other instructions on the various theories of recovery and defense, and thus does not constitute misdirection or misstatement of the law of the case.

■ On the charge of repetition and undue emphasis appellant cites Rice v. Jefferson City Bridge & Transit Co., Mo., 216 S.W. 746, 753 [11–16], Harrison v. Bence, Mo., 270 S.W. 363, 364 [2], Harris v. St. Louis Public Service Co., Mo., 270 S.W.2d 850, 855 [5, 6], and Miller v. Williams, Mo., 76 S.W.2d 355, 357 [6, 7], where we have recognized the proposition that instructions should not be repeated because this would destroy their purpose and tend to confuse and mislead the jury.

■ This litigation is concerned with how the action of the Missouri River caused

land to form, and instructions submitting the parties' theories necessarily contain references to those terms or the action for which the term stands. Our examination of the complained-of instructions does not indicate any undue repetition or emphasis, "(a)nd in any event repetition or elaboration in an instruction, where there is no misstatement or misdirection as to the law therein, is generally considered to be within the trial court's sound discretion." Harris v. St. Louis Public Service Co., supra, 270 S.W.2d l. c. 856[8]. We have determined above that the instructions in question do not contain misstatement or misdirection and "repetitious instructions will not constitute reversible error unless it plainly appears that they were in fact calculated to confuse or mislead," Harrison v. Bence, supra, 270 S.W.2d l. c. 364[2], a situation which is absent from this case.

In Point III appellant contends the verdict in favor of Dudecks and Courters is against the weight of the evidence because it is contrary to the physical facts and the credible evidence in the case in that the testimony of Dudeck and Courter that land formed by building out from their high bank and that there never was an island or slough north of their land was shown to be false by their own witnesses, Riddle and Eblen, by Ellis's witness Lowe, and by some eight witnesses who testified as to conditions in Belmont Bend through the years. The gist of the argument is that plaintiff's evidence does not overcome a prima facie case made by the issuance and recording of the patent, and that the testimony of Earl Dudeck and William E. Courter is contrary to physical facts and to exhibits in evidence identified by plaintiffs' witness Riddle, Lohmann v. Wabash R. Co., 364 Mo. 910, 269 S.W.2d 885, 888, Dunn v. Alton R. Co., 340 Mo. 1037, 104 S.W.2d 311, 314[1, 2], and should not, therefore, be accepted as substantial evidence.

The transcript indicates that respondents have taken the position throughout that there was no island at the location mentioned in Ellis's patent; that Ellis could receive nothing by his patent but a mere recital of title because Buchanan County had nothing to convey; and that the quiet title action was to clear such cloud from their title to accretions. In such situation Ellis, in defense of the quiet title action, made a prima facie case for himself on his patent from Buchanan County, Hatch v. Rhyne, Mo., 253 S.W.2d 170, 173[6, 7]; but, even though a patent be prima facie evidence, such evidence is subject to rebuttal by extrinsic evidence, Morgan v. Stoddard, 187 Mo. 323, 86 S.W. 133, 135; and we said in Conran v. Girvin, supra, 341 S.W.2d l. c. 79[1, 2]: "While the fact that the county had the land surveyed and then issued a patent therefor on the basis that it was an island to which it had title by reason of Section 241.290 or Section 241.300 is entitled to substantial weight, it is not conclusive on the issue of whether there was then or ever had been such an island. * * That issue is for the trier of the facts * * *."

Appellant argues that the extrinsic evidence adduced by respondents is not sufficient to overcome his prima facie case, but, contrary to the charge of conflict between testimony of their witness, Riddle, and respondents' own testimony, Mr. Riddle testified, as did plaintiffs, that "on September 8, 1940, there was no body of land completely surrounded by water north of the Dudeck property." This testimony is particularly significant in its agreement because it refers to the time when Ellis purchased his patent, and Ellis admitted that he did not have an engineer or surveyor to survey any island, all of which is entirely consistent with plaintiffs' Exhibits 6 and 8, the 1940 aerial photographs, which showed the pertinent physical fact of no island present at the location in issue. Ellis admitted that the photograph was made within five days of the preparation of his patent by Chaiborel. Likewise, in respect to Exhibits 3, 4, and 5, respondents' and Riddle's testimony was not in contradiction because Riddle identified those exhibits as not showing any

body or bodies of land surrounded by water in the area in issue. Any conflict between plaintiffs' case and the impression and testimony of defendants' witnesses, Lowe and Eblen, would be properly resolved by the jury because mere disagreement in their reading of the exhibits does not, as a matter of law, discredit plaintiffs' case; and Lowe also assisted the jury in resolving the issue for respondents in that he testified that there were accretions to the south bank between 1936 and 1940 at the site of the revetments extending into the river from respondents' land.

By Point IV appellant charges the court with error in refusing to permit him to show that he had sued witness James Muff in order to show his "interest, animus and bias and prejudice."

James Muff was called by Schweizers and cross-examined by Dudecks and Courters on their case, as well as by Ellis, at the conclusion of which the following took place:

"Q (By Mr. Randolph, Jr.) By the way Mr. Muff, you were sued as a defendant in this case? A No.

"MR. REED: What is the purpose of such cross-examination? We object to that. THE COURT: The objection is overruled.

"Q Your name is James Muff? A. That's right. Q Do you say you were not served with a Summons in this matter and sued as a Third Party Defendant? A Not that I know of. Q Let me show you here, this Third Party summons. Isn't that your name—it was filed in this Court on the 10th day of August, 1959. A I never knew nothing about it. Q You didn't know you were a defendant? A In this lawsuit, no, I didn't.

"MR. RANDOLPH, JR: That will be all.

RE-RE-RE-DIRECT EXAMINATION BY MR. REED: Q Do you claim to own any of this land out there? A Not any

more. THE COURT: That takes care of that then. WITNESS EXCUSED."

Schweizers proceeded with another witness to the conclusion of their case after which appellant made his offer of the original summons and service on Muff. The return shows it to have been served on *Jacob* Muff, brother of *James* Muff. We have held it error to exclude evidence showing bias or prejudice of an adverse witness, State v. Day, 339 Mo. 74, 95 S.W.2d 1183, 1185 [2-5]; however, the quoted record shows that Ellis's questions relating to any bias and prejudice on the part of Mr. Muff were limited to whether he knew he had been served as a defendant, and the evidence offered proves only that a summons naming him as a defendant was served upon his brother, Jacob Muff. The offer did not of itself impeach the witness in his denial of knowledge that he was a defendant and was thus properly refused.

In Points V and VI appellant charges that the court erred in not allowing him to use a survey of shore of island, slough and high bank when being cross-examined by respondents as to widths of the slough in 1940.

This assignment involves an exhibit known as Ellis's Exhibit 6 and a situation best shown by the following testimony of Mr. Ellis:

"Q Mr. Downs examined you at great length about the width of this slough or the width of running water at various times you were out there? A Yes sir. Q Can you give the jury a more exact idea of the width of that slough or running water by referring to some documents?

"MR. DOWNS: Your Honor, that has all been gone through.

"THE COURT: He stated several times if he had a document, he could do a better job. The objection is overruled.

"Q Can you do that? A Yes sir. I had Mr. Riddle make me a plat. Q Of

what? A The slough that ran from the east end or west end.

"MR. DOWNS: That is objected to. How can this witness read something when he has no independent recollection? He says 'approximately this' and 'approximately that', and now I assume Mr. Randolph, Jr. wants to hand him something and say: 'Does that refresh your recollection?' I think it is improper to use this document.

"MR. RANDOLPH, JR: The witness says if he has this to refresh his memory, he can give exact distances and exact points.

"Thereupon, follows an off-the-record discussion between the Court and counsel.

"MR. RANDOLPH, JR: At this time I would like to reoffer Defendant (Ellis) Exhibit 6. THE COURT: The offer is denied."

Mr. Ellis had been on the stand for quite some time and had testified at length about the width of water in various parts of the slough. The exhibit in question was previously refused by the court for want of evidence or foundation for it, and the above recital does not suggest any offer of proof or further identification that would serve as a proper foundation to cause its admission into evidence or for use to refresh the witness's memory. Neither does it appear to have been offered for the specific purpose of refreshing memory but merely reoffered without any additional foundation. The use of an exhibit for the purpose of refreshing memory or recollection rests in the discretion of the court, and these circumstances do not show an abuse of that discretion. State v. Bradley, Mo., 234 S.W. 2d 556, 560 [10, 11]; Voyles v. Columbia Terminals Co., Mo.App., 223 S.W.2d 870, 871 [3–5].

Appellant's Point VII charges error in not admitting his Exhibit 27 "because it showed an overall picture of the island."

Exhibit 27 was described as a 1961 photograph taken from the Kansas side. Ac-cording to Mr. Ellis, part of his land shows, but the area in controversy was never located on the exhibit; and there was no showing of what the exhibit would prove *at the time of offer*. Prior to denial of the exhibit, the following transpired:

"The Court: What is this in the middle of the picture? The witness (Ellis): A fishing lake I made in the bed of the river. The Court: On the left of it is Kansas? The Witness: The center of it would be Kansas—from there on north."

We said in Davis v. Illinois Terminal R. R. Co., Mo., 307 S.W.2d 395, 400 [3], that " * * * photographs are admissible in evidence even though taken long after the event and when changes have occurred, if the changes are explained, and, when so explained, the photographs reasonably may aid the jury in arriving at an understanding of a fact or facts that have a direct bearing upon the issues," and we there held it was prejudicial error for the court to exclude photographs which were *material* and *competent* evidence. See also Young v. Dunlap, 195 Mo.App. 119, 190 S.W. 1041, 1044 [10]. The determination of relevance and materiality of a photograph and its admission or rejection rests in the first instance in the discretion of the trial judge, and his ruling will not be disturbed on appeal unless that discretion has been abused, State ex rel. State Highway Commission v. Cone, Mo., 338 S.W.2d 22, 27 [12, 13], Fox v. City of Kansas City, Mo. App., 343 S.W.2d 200, 201 [2, 3], and the circumstances of this case detailed above do not show any abuse of such discretion.

Under Point VIII appellant says: "(a) Under Schweizer's evidence * * *, the land in the slough opposite the Schweizer land should have been divided by following the line of the ditch between Schweizer and Ellis, as shown by Dudeck and Courter exhibit 6. Because all of their witnesses said the ditch was there, and the exhibit showed the ditch.

"(b) Under Ellis' evidence, the land built up evenly on both sides of the slough. The center of the slough should have been the dividing line."

■ Neither of these contentions was presented to the trial court by after-trial motions as required by Civil Rule 83.13(a), V.A.M.R., and are thus not preserved for appellate review. Hart v. City of Butler, Mo., 393 S.W.2d 568, 576 [9].

■ Appellant continues under Point VIII: "The decree, quieting title to the Ellis south shore line of the island opposite Schweizer, is not supported by any evidence." He argues that "At no place in the record did any witness testify that the land in the slough opposite Schweizer accreted all the way to the shore line of the island, and yet the Court * * * on a verdict simply finding for Schweizers on their counterclaim and * * * on * * * Ellis' action, rendered a judgment and decree quieting title to the south shore line of the Ellis island north of the Schweizer land * * *." The record does not support this charge. Pearl Schweizer testified that there was a depression along the *south side* of the Ellis land where the line stakes between Ellis's property and Schweizers' were located by Riddle at the request of appellant; Mr. Riddle testified that land formed from the south next to the Schweizer high bank and went downward to a gully or low depression and that the stakes on the south line of the Ellis tract were put along the north side of that depression; Mr. Keller, Schweizers' predecessor, testified that he farmed the land between the high bank and Ellis's stakes and that Ellis told him the land south of where the stakes were set was his; Mrs. Keller testified that the stakes were on the north side of a little chute; and Mr. Muff said that the land sloped upward to the south from the stakes.

In Point IX appellant says the court erred in giving Instruction No. 6 which told the jury "* * * that the law of accre-

tions does not permit the extending of accretions across a well defined slough of water, or arm of the river that carried running water at the lowest ordinary stage of the river." Appellant argues that the instruction is in conflict with Instruction 6a given at appellant's request: "* * * that the law of accretion does not permit the extending of accretions across a well defined body of water," saying that it is not necessary that the "body of water" be running water, citing Crandall v. Smith, 134 Mo. 633, 36 S.W. 612, De Lassus v. Faherty, 164 Mo. 361, 64 S.W. 183, 58 L.R.A. 193, and Peterson v. City of St. Joseph, supra.

■ Neither the instructions nor the cases support the charge of conflict. Read together, Instructions 6 and 6a simply tell the jury that accretions cannot be extended across (1) a well-defined slough of water, *or* (2) an arm of the river carrying running water, *or* (3) a well-defined body of water. The cases support each situation as one across which accretions cannot be extended.

Under Point X appellant asks that we consider three matters as plain errors under Civil Rule 79.04.

Appellant says of one of these that it is "covered under Point II herein," and we decline the invitation to discuss the remaining items because they are not indicative of "manifest injustice or miscarriage of justice" within the meaning of the rule.

Appellant charges next that the court erred in entering its summary judgments because (I) as to Schweizers, a jury issue of damages for trespass remained; (II) as to Dudecks and Courters, a jury issue of the value of improvements made by Ellis to the property in litigation remained, and (III) the judgment and decree of possession in favor of Dudecks and Courters does not properly describe the real estate sought by their pleadings and evidence.

On (I) appellant points to his testimony on the trespass issue to the effect that he had a surveyor place stakes along his south

line which Schweizer moved, causing him to expend $279 for another survey, and that Schweizer plowed up some of his wheat. Schweizer admitted moving a stake because Ellis kept moving his line over on him and that he plowed about one-eighteenth acre of wheat in order to straighten out the line. There was no instruction offered, refused, or given on this matter at the trial. On (II) appellant points to the allegation in his amended cross claim against *Dudecks* and *Courters* to the effect that he expended $20,000 in clearing and improving his land (Tract 1), which he would be entitled to recover if dispossessed. *There is no prayer for this amount,* and at the trial the only reference to this sum is contained in the following:

"Q Now Mr. Ellis, how much was the reasonable value of the clearing of this land?

"MR. DOWNS: That is objected to as not tending to prove or disprove anything in this case * * *.

"THE COURT: What is the purpose of this question * * * about how much it cost to clear this land? MR. RANDOLPH, JR: It goes to show our damages and what we are entitled to. THE COURT: What damages? MR. RANDOLPH, JR: We have asked for damages. THE COURT: For what? Against the Dudecks and the Courters? MR. RANDOLPH, JR: *Against Schweizers.* * * *

"MR. RANDOLPH, SR: I would like for the record to show that if permitted to testify, this witness would testify that it cost him $135.00 an acre to clear this land and get it ready for farming.

"We say that in view of the fact he only paid $1.25 an acre for the land, that the fact he now has improved it, tends to show the work that was done, and it is competent to show what he expended to improve the land for the purpose of showing the value of the land now. In all of these cases that I have tried where the land was cleared, we

have been allowed to show what improvements were made on the land.

"MR. RANDOLPH, JR: Further, it tends to show and goes to the claim of Defendant Ellis for damages against the Third Party Defendants *Schweizers.*

"THE COURT: It is the Court's understanding there is the cost of clearing some 200 or more acres, is that correct? MR. RANDOLPH, JR: The defendant will state that it cost $135.00 an acre to get the land ready for cultivation. THE COURT: The entire island? MR. RANDOLPH, SR: Yes.

"THE COURT: The offer of proof is denied.

"MR. RANDOLPH, SR: We make the further offer of proof that this evidence is further admissible on the claim for the rents and profits. The land would not have been worth anything or at least, the nominal value only in the condition it was in before the defendant cleared it. THE COURT: The offer is denied."

 We have underscored parts of the offer to show that it was made as against Schweizers rather than as against Dudecks and Courters, and it is also clear that the offer was not competent or relevant against either because it relates to the clearing of more than two hundred acres of land where only small acreages were in issue between Ellis and Schweizers and between Ellis and Dudecks and Courters. The court did not err, therefore, in excluding the offer and, as in the case of trespass against Schweizers, no instruction was offered, refused or given as to such a claim for improvements against either set of parties and same are deemed to have been abandoned. Cantrell v. City of Caruthersville, 359 Mo. 282, 221 S.W.2d 471, 477 [9].

Under Civil Rule 74.04(a) V.A.M.R., parties moving for summary judgment may file and serve supporting affidavits as both

sets of respondents have done here. Under Civil Rule 74.04(c), V.A.M.R., the adverse party (appellant here) may serve opposing or counteraffidavits and all affidavits are then considered along with the pleadings, depositions and admissions on file, to determine if any genuine issue of fact remains. Maddock v. Lewis, Mo., 386 S.W.2d 406, 408 [1]. And, under Civil Rule 74.04(e), V.A.M.R., when the motions are supported by affidavits as provided by the rule, the adverse party may not rest upon his allegations or denials, but his response, by affidavits or otherwise, must set forth specific facts showing a genuine issue for trial. If he does not so respond, summary judgment may be entered against him. Appellant has not pointed up any specific facts showing a genuine issue for trial in response to this requirement, and, with the issue of ejectment following the title and the issues of trespass and damage having been abandoned, all as suggested by respondents' motions and supporting affidavits, and as demonstrated above, summary judgments were proper on the issues of ejectment, trespass, and damages.

Finally, appellant says (III) that the court has erred in the descriptions used in the quiet title and ejectment judgments and decrees favoring Dudecks and Courters. The gist of this complaint is that the descriptions used allegedly enclosed lands now owned by *Buchanan County* under Section 241.290 V.A.M.S., which, if so, is a situation to be remedied by that owner rather than by appellant.

The judgment is affirmed.

HOUSER and WELBORN, CC., concur.

PER CURIAM:

The foregoing opinion by HIGGINS, C., is adopted as the opinion of the court.

All concur.